[Cite as *MVSG, L.L.C. v. Knight*, 2019-Ohio-1551.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| MVSG, LLC | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 28174 |
| | : | |
| v. | : | Trial Court Case No. 2017-CV-5931 |
| | : | |
| DOUGLAS KNIGHT, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of April, 2019.

. . . . . . . . . . .

SCOTT L. BRAUM, Atty. Reg. No. 0070733 and TIMOTHY R. RUDD, Attorney Reg. No. 0075490, 812 East Franklin Street, Suite C, Dayton, Ohio 45459
    Attorneys for Plaintiff-Appellant

MICHAEL W. SANDNER, Atty. Reg. No. 0064107, 2700 Kettering Tower, 40 North Main Street, Dayton, Ohio 45423
    Attorney for Defendant-Appellee

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} MVSG, LLC, appeals from a judgment affirming the administrative decision of Vandalia Police Chief Douglas Knight to deny MVSG's application for an outdoor permit to discharge firearms.[1]   According to MVSG, the trial court erred as a matter of law when it overruled MVSG's arguments and affirmed the police chief's decision.

{¶ 2} We conclude that the trial court did not abuse its discretion and that its decision was also supported by a preponderance of reliable, probative and substantial evidence.   Accordingly, MVSG's assignment of error lacks merit, and the judgment of the trial court will be affirmed.

I.   Facts and Course of Proceedings

{¶ 3} As background, Chief Knight was a police officer from 1979 until his death in April 2018 (after this litigation began).   Knight served with the Vandalia Police Department from 1979 to 1986, and later served as police chief from 1988 until his death.

{¶ 4} MVSG operates a shooting range on approximately four acres of agriculturally-zoned land located on Johnson Station Road in Vandalia, Ohio.[2]   The range has been operated at the same location since 1953.   Before 1988, the range was part of a township, not the city, and Knight did not know of any shooting permits that were required before the property was annexed to the city in 1988.

{¶ 5} Prior to 1991, Vandalia did not allow firearms to be discharged in the city.

---

[1] Knight died during the pendency of the case, and the current police chief, Kurt Althouse, has been substituted as the Defendant.

[2] The road is also referred to as S. Cassel Road.

However, in 1991, Vandalia adopted Section 978.09 of the Codified Ordinances of Vandalia, Ohio. Although firearms still could not generally be discharged, Section 978.09(c) stated that "The Chief of Police is hereby authorized to issue a permit to discharge any air gun, rifle, shotgun, revolver, pistol or other firearm within the corporate limits of the Municipality to any person or organization where the Chief of Police finds that such discharge will not be detrimental to the health, safety, welfare and morals of the Municipality." According to Chief Knight, this provision was adopted so that persons could continue what they been doing on rural agricultural land after their land was annexed to Vandalia.

{¶ 6} After the shooting range property was annexed in 1988, it nonetheless operated without a shooting permit from 1988 to 1991. The first permit was issued in 1994 to an entity called Relo Sporting Goods. At some point, Relo went out of business and its permit expired. Another permit was issued to David Williams, but that permit was revoked between 2004 and 2007, due to persons shooting from north to south and because projectiles were landing on property to the north, where a Unibilt facility was located.

{¶ 7} After Dana Tackett purchased the property, he applied for a conditional use permit in November 2007, asking to use the property to conduct academic and firearm training for private security, law enforcement, and other organized training programs. At the time of Tackett's application, the property's existing use was solely as a shooting

range.  *See* Doc. #11, Transcript ("Tr."), Ex. 2.[3]  Under the proposed conditional use, the building on the property was to include classroom spaces, and firearms training was to be conducted on a large outdoor range located northwest of the main building.  The direction of fire was also changed from the north to the west.  *Id.*

{¶ 8} In November 2007, Knight granted Tackett and MVSG a permit to discharge firearms.  Tr. at Ex. 8.  Among other things, the permit stated that:

Shooters may only fire their weapons in a direction from east to west perpendicular to and using as a backdrop the 50-foot hill on the western edge of the property.  The permit holder must take all necessary measures and provide supervision sufficient to ensure that projectiles are confined to the property. * * *

This permit is issued pursuant to Sections [sic] 678.09 of the Codified Ordinances of the City of Vandalia, Ohio. The Chief of Police may revoke this permit at any time upon written notice to the permit holder.

*Id.*

{¶ 9} After receiving the permit, Tackett operated the shooting range generally without incident until some complaints about noise arose in 2013.  A community sound level assessment was done in August 2013 and indicated that "The Miami Valley Shooting Grounds do not exceed the allowable criteria for Shooting Ranges.  The only time the sound level exceeds 85 dB(A)[the acceptable sound level under the Ohio Revised Code]

---

[3] The record in this case was filed in different stages, with a transcript (Doc. #11), an amended transcript (Doc. #12), and a three-part proposed record of supplemental records (Doc. #25, #26, and #27).  The trial court allowed most of these materials to be submitted and considered.

is when trains are passing on the west side of the shooting range's property." Tr., Ex. 11, Report of Acoustical Systems, Inc., p. 10. Because Tackett did ask for recommendations, the report provided three recommendations, with the only viable option being to add acoustical absorption materials to the inside of existing concrete barriers at the 50 and 90 meter high power ranges. *Id.* at 11.

{¶ 10} In 2016, Jamie Spencer purchased an 80-acre property located on Brown School Road, west of the shooting range. A 50-foot embankment and railroad tracks separated the properties. Between May 2016 and September 2017, Spencer made many complaints to the police department about the shooting range. These included allegations of bullet rounds coming onto Spencer's property, shooting that was not done during permissible hours, and questions about whether firing of fully automatic weapons was allowed. *See* Tr., Exs. 15, 16, and 17.

{¶ 11} In late August 2017, Vandalia police officer Cody Anderson investigated a report from Spencer that rounds were landing on his property. When Anderson went to the range, no range officer was supervising the rifle range. *Id.* at Ex. 15 (August 27, 2017 Anderson Report). Subsequently, on September 7, 2017, Spencer again reported a problem about rounds (this time, they were landing on Unibilt's property). *Id.* at Ex. 16 (September 7, 2017 Anderson Report). At that point, Anderson and Spencer walked onto the Unibilt property and heard rounds being fired toward that property. Anderson observed a range facing southward, and at least six people were shooting southward. Another range faced northward, and people were shooting northward also. After Anderson started to retreat to the east, a round came in a southeasterly direction over his head; he then retreated behind his cruiser and called for his sergeant.

{¶ 12} While Anderson was behind his cruiser, he heard multiple shots coming southward through a wooded area and also heard loud "pings" to metal. He was unable to tell if this sound came from targets or a train being struck. At that time, Spencer showed Anderson the 2007 permit, which stated that shooters were only allowed to shoot from east to west. Because the permit was being violated, the police department shut down the range. *Id.*

{¶ 13} After an investigation, Chief Knight sent Tackett a letter on September 25, 2017, listing four possible violations of the permit, including that Tackett had not taken all needed supervisory measures to confine projectiles to the property and that shooters were firing weapons in directions other than from east to west "perpendicular to and using as a backstop the 50-foot hill on the property's western edge." Tr., Ex. 18, p. 2. Knight asked Tackett to meet with him to discuss the issues, and indicated he would make a decision within five days of the meeting. Knight also informed Tackett of his right to further appeal to the city manager. *Id.* On October 9, 2017, Knight revoked the permit, listing five grounds, consistent with the violations raised in Knight's prior letter. Tr., Ex. 21, p. 1.

{¶ 14} Tackett's position was that the "South Ranges" were used mainly for law enforcement training, including the training of Vandalia police officers, and that MVSG "incorrectly but sincerely believed that there was no prohibition for continuing to use such based on the South Ranges' prior use." Doc. #25, Ex. 50 (Tackett Affidavit), ¶ 11. After Knight revoked the 2007 permit, no further appeal was taken.

{¶ 15} Instead, on November 3, 2017, MVSG applied to Knight for an outdoor permit to discharge firearms. *See* Doc. #26, Item 31 (Knight Deposition Ex. 3). In the

application, MVSG asked for a permit for "a 90-yard rifle range, a 50-yard rifle range, and a 25-yard pistol range with an adjacent shotgun testing area." *Id.* at 1. The first three ranges would be under roofed enclosures, which would eliminate a shooter's ability to "shoot with an upward trajectory sufficient to enable firing outside of the target area." *Id.* at 3-4. All the ranges were also to have the 50-foot high natural hill as their backdrop. *Id.* at 1.

{¶ 16} Along with the application, MVSG submitted a policy called "MVSG, LLC Outdoor Ranges, Shooter Supervision Policy." *Id.* at Item 32 (Knight Deposition Ex. 3A), p.1. Under this policy, at least one NRA- or OPOTC-certified range security officer ("RSO") would be assigned per six active shooting lanes; if more than six lanes were to be used, the seventh lane could not be used until a second security officer arrived. *Id.* No security officer would be required in certain cases, like where the persons using the range were active-duty military, sworn police officers, and certified RSOs. *Id.* at 2. All first-time shooters were also required to obtain instruction and an assessment. *Id.*

{¶ 17} Previously, on October 24, 2017, MVSG had applied for a permit to discharge firearms in an indoor range located at MVSG's premises. *See* Doc. #27, Item 40 (Knight Deposition Ex. 4), p.1. This application included the same shooter supervision policy that accompanied the outdoor application. *Id.* Knight approved the application for an indoor permit, with conditions, including that no outdoor shooting would be allowed, and that MVSG at all times would adhere to the Shooter Supervision Policy it had submitted. *Id.* at Item 41 (Knight Deposition Ex. 8), p. 1.

{¶ 18} On November 21, 2017, Knight denied MVSG's application for the outdoor permit. *See* Doc. #12, Amended Transcript ("Am. Tr."), Ex. 26. Knight concluded that

issuing the permit "would be detrimental to the health, safety, welfare, and morals of the City." *Id.* at 1. Knight gave the following explanation for the denial:

The original permit issued to MVSG was for substantially the same ranges and under the express provision that, among other things, there be adequate supervision. Our prior findings in revoking the prior permit identified, in part, that such required supervision was lacking. A promise and policy regarding enhanced supervision in the future is not persuasive.

Since the time of the issuance of the original permit, there have been substantial changes in the surrounding neighborhood, with construction of more residential dwellings. As such, permitting an outdoor shooting range at this location is now detrimental to the peace and welfare of many residents that were not there in 2007.

An outdoor shooting range is inconsistent with the City's Future Land Use Map, which sets forth the desired land uses for that area.

Ex. 26 at p. 1.

{¶ 19} Although MVSG invited Knight and the Vandalia City Manager to visit the premises and to reconsider the denial, they did not see the need to go. *See* Doc. #27, Item 42 (Knight Deposition Ex. 9). As a result, on December 20, 2017, MVSG filed a notice of appeal to the common pleas court. After the administrative record was filed, the trial court allowed MVSG to supplement the record with Knight's deposition and some other documents. The parties then filed briefs.

{¶ 20} After considering the administrative record, the trial court affirmed Knight's decision to deny the outdoor permit. This appeal followed.

II.   Did the Trial Court Err as a Matter of Law in Affirming Knight's Decision?

**{¶ 21}** MVSG's sole assignment of error is as follows:

The Trial Court Erred as a Matter of Law When It: Overruled MVSG's

Administrative Appeal and Affirmed the Agency Decision at Issue.[4]

**{¶ 22}** Under its assignment of error, MVSG contends that the trial court erred as a matter of law in affirming Knight's decision because Knight's decision was not supported by a preponderance of reliable, probative, and substantial evidence.

**{¶ 23}** This administrative appeal was initiated under R.C. 2506.01.   In such appeals, "the common pleas court considers the whole record and determines whether the administrative order is 'unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence.' " *Independence v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, 28 N.E.3d 1182, ¶ 13, quoting R.C. 2506.04.   After the common pleas court weighs the evidence and decides the administrative decision is properly supported, "the court may not substitute its judgment for that of the" administrative body.   *Id.*, citing *Dudukovich v. Lorain Metro. Hous. Auth.*, 58 Ohio St.2d 202, 207, 389 N.E.2d 1113 (1979).   Conversely, if the court finds that the decision is not properly supported, it "may reverse, vacate, or modify the administrative decision."   *Id.*

**{¶ 24}** As an appellate court, our review is more limited.   *Id.* at ¶ 14.   We may

---

[4] Appellee, current Police Chief Kurt Althouse, has addressed four assignments of error that MVSG purportedly made.   However, MVSG clearly states only one assignment of error in its brief.   We will address the arguments that MVSG has raised, while retaining the format (one assignment of error) that it elected.

review "the common pleas court's judgment only on questions of law," and we do "not have the same extensive authority to weigh the evidence." *Id.* However, included within the ambit of questions of law that we may decide "is whether the common pleas court abused its discretion." *Id.*, citing *Kisil v. Sandusky*, 12 Ohio St.3d 30, 34, 465 N.E.2d 848 (1984), fn. 4.

{¶ 25} An abuse of discretion "has been defined as an attitude that is unreasonable, arbitrary or unconscionable." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). However, "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *Id.* "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *Id.*

{¶ 26} Notably, we must affirm the common pleas court unless we find "as a matter of law, that the decision of the common pleas court is not supported by a preponderance of reliable, probative and substantial evidence." *Kisil* at 34.

{¶ 27} The trial court concluded that two of Knight's stated reasons for denial were not supported by the evidence. These reasons were that the neighborhood had substantially changed since the permit was issued, and that an outdoor shooting range was inconsistent with the City's Future Land Use Map and desired land uses. However, the court did find substantial evidence supporting Knight's third reason, i.e., that MVSG's "promise and policy regarding enhanced supervision in the future is not persuasive."

Doc. #41, p. 8.

{¶ 28} MVSG's first argument appears to be that it was entitled to a de novo review. The Supreme Court of Ohio has said that:

> Although a hearing before the Court of Common Pleas pursuant to R.C. 2506.01 is not de novo, it often in fact resembles a de novo proceeding. R.C. 2506.03 specifically provides that an appeal pursuant to R.C. 2506.01 "shall proceed as in the trial of a civil action," and makes liberal provision for the introduction of new or additional evidence. R.C. 2506.04 requires the court to examine the "substantial, reliable and probative evidence on the whole record," which in turn necessitates both factual and legal determinations.

*Cincinnati Bell, Inc. v. Village of Glendale*, 42 Ohio St.2d 368, 370, 328 N.E.2d 808 (1975). *Accord Baker v. Mad River Twp. Bd. of Zoning Appeals*, 2d Dist. Champaign No. 2008 CA 16, 2009-Ohio-3121, ¶ 51.

{¶ 29} While the review resembles a de novo hearing, it is not actually de novo. The standards of review in R.C. 2506.04 that "a court of common pleas must employ and the dispositions that it must reach are more limited than relief that could be awarded pursuant to a trial, and therefore, the administrative appeal is more akin to an appeal than a trial." *AT&T Communications of Ohio, Inc. v. Lynch*, 132 Ohio St.3d 92, 2012-Ohio-1975, 969 N.E.2d 1166, ¶ 14.

{¶ 30} In the case before us, the trial court did let MVSG supplement the record, including taking and submitting the deposition of Chief Knight. MVSG does not suggest how it was deprived of a de novo hearing; it simply argues that Knight's grounds are not

supported by any evidence.   We will discuss that point later.

{¶ 31} MVSG next contends that while Knight had previously denied permit applications, he could not recall denying applications for reasons other than a lack of agricultural zoning or that an applicant was not the landowner.   The relevance of this point is unclear.   If other shooting ranges applied for permits, that might theoretically (but not likely) be pertinent.   However, MVSG failed to submit any such evidence.

{¶ 32} The next argument that MVSG presents is that the trial court correctly rejected two of Knight's findings.   This is irrelevant, because no cross appeal has been filed, nor has the police chief argued that these two reasons are a basis for upholding the denial of the permit.   See App.R. 3(C); *Fed. Ins. Co. v. Fredericks*, 2015-Ohio-694, 29 N.E.3d 313, ¶ 82 (2d Dist.) ("even where a party does not file a cross-appeal, he or she may advance arguments to prevent reversal of a trial court judgment").   The real issue is whether the court erred as a matter of law or abused its discretion with respect to Knight's third reason for denying the permit.

{¶ 33} According to MVSG, the trial court erred because the outdoor ranges are virtually indistinguishable from the indoor range in terms of projectile containment and the proposed supervision policy.   In addition, MVSG contends that, if Knight's concerns were legitimate, Knight could have imposed appropriate conditions on the permit.

{¶ 34} We have reviewed the entire record, including Knight's deposition, the proposed supervisory policies, and the November 10, 2017 Range Evaluation Report, and we find no error or abuse of discretion by the trial court.

{¶ 35} As noted, after an investigation, Knight revoked the existing permit for the shooting grounds on October 9, 2017.   Rather than appealing to the City Manager,

MVSG submitted an application for a new outdoor permit shortly thereafter. As before, the proposed ranges had as a backdrop the 50-foot hill, i.e., the permit was designed to have parties shoot in the same direction as dictated by the permit issued in 2007. Am. Tr., Item 25, pp. 1-2.

{¶ 36} According to the Range Evaluation Report, "[t]he current baffle system establishes a 'No Blue Sky' range which results in the highest level of projectile containment. The no blue sky baffle system as it is installed and with the additional benefit of the concrete side berms, and the 13 inch high shooting ports, makes it impossible for a projectile to leave the shooting bay."[5] As noted, the proposed outdoor range supervision policy was the same as the indoor policy, required an RSO for every six active shooting lanes, and contained other security policies. Doc. #26, Item 32, Knight Deposition Ex. 3A at p. 2.

{¶ 37} Knight was aware of these facts, and did not object to the supervision policy. However, he was also aware of the reasons why the 2007 permit had recently been revoked. In this regard, the following exchange occurred:

> Q. The 2017 [indoor] permit that you issued –
>
> A. Right.
>
> Q. – contained the exact same substantive supervision policy and
>
> you granted that permit, specifically, contingent on the shooting grounds
>
> following that policy; correct?

---

[5] The administrative record is poorly indexed. This report is attached to MVSG's reply memo on supplementing the record. *See* Doc. #19. The parties then stipulated that the report would be added as Item 27 in the amended transcript. *See* Doc. #20. The quote is taken from page 4 of the report. Confusion is also added by the fact that some documents are labeled as "Items" and others are labeled as "Exhibits."

A.   That's true.

Q.   And yet when you denied the outdoor permit on November 21, you said, basically, you don't believe him?

A.   As it relates to the outdoor range, I was not convinced that the adoption of the policy was going to promote public safety based on the circumstances we had before.

Q.   Which were what?

A.   Shooting in directions other than east to west.

Q.   Okay.   Anything else?

A.   The lack of – supervision not present, the shooting that occurred on the – what you referred to, I think, as the south range, which was not part of the original permit premise, that the policy alone – really, adopting the policy * * * would not provide the level of safety that I believed needed to be present for us to be able to grant the outdoor permit.

* * *

The WITNESS:   If there was absolute adherence to the policy and I had confidence that the policy would be followed, I believe that it would be safer than the circumstances we encountered in September.

Q.   Safe enough to issue the permit?

A.   Likely.

Doc. #26, Item 28, Knight Deposition, pp. 59-61.

{¶ 38} Clearly, Knight did not believe that shooters would be adequately supervised, no matter how the shooting grounds were configured or what policies were

adopted.   Knight had legitimate reasons for concern.   The 2007 permit made it quite evident that shooters were only allowed to shoot from east to west.   However, there were numerous cases where that did not occur, and people were shooting from north to south, as well as in the opposite direction.   The most notable incident caused significant potential for harm to a police officer, who was forced to retreat behind his car.   Furthermore, the original permit required supervision to prevent projectiles from leaving the property.   That also did not occur, as there were reports to police that rounds were leaving the property.   In addition, officers observed a lack of supervision of shooters on more than one occasion.   *See* Tr., Exs. 15, 16, and 17.

{¶ 39} As was noted, MVSG contends that the trial court erred in concluding that the indoor range presented less of a safety risk than the outdoor range.   According to MVSG, both ranges have the same safety policy and both are equal in terms of projectile containment.   However, the trial court noted that "[t]he inherent dangers of shooting a weapon inside rather than outside differ greatly in terms of safety of those outside the confines of the building," and that the ability to supervise differs as well, because "[a]n outdoor range covers a larger area that may be harder to manage and view than an indoor range."   Doc. #41 at p. 9.   We cannot conclude that the trial court abused its discretion.

{¶ 40} Knight made the same observations in his deposition, stating his belief that "the indoor range, one, provides a greater level of security for the community, the round's [sic] less likely to stray; secondly, that it was – would be easier to supervise shooters on the indoor range than the outdoor range and that * * * the supervision and monitoring would be more easily achieved indoors than out of doors."   Doc. #26, Item 28, Knight Deposition at pp. 111-112.

**{¶ 41}** When questioned further as to the basis for his opinion, Knight stated that:

I guess, put it in simple terms, I have after 30 years, 46 years as a police officer, have become convinced that past performance is the best predictor of future performance.

\* \* \*

And that the issues I experienced or that I interpreted, based upon all of the information that was available to me, that there was a greater likelihood of us not having the issues that we confronted with use of the indoor range than there would be with the outdoor range.

*Id.* at 113.

**{¶ 42}** Knight also mentioned Tackett's statement that he (Tackett) was not going to "babysit" his shooters, and that he took Tackett's word at face value. *Id.* at 114. In addition, the supervision policy had disclaimers for certain parties, like certified instructors and academy classes. As a result of these factors, Knight thought it would be difficult for Tackett to assure compliance with the standards outdoors as opposed to indoors. *Id.* at 114-115.

**{¶ 43}** Moreover, in addition to Knight's own experience, the record indicates that no complaints or issues had ever occurred concerning the indoor range, which did, in fact, receive a permit in 2017. To the contrary, however, there were documented problems with the outdoor range. Knight was not required to believe MVSG's assertions that the proposed supervision policy would be followed outdoors.

**{¶ 44}** MVSG also contends that Knight did not even know what the permit was for – that he thought the application was for a south range, not for ranges that involved

shooting from covered, enclosed structures. This is incorrect. The permit application (which Knight said he read) asked for a permit for ranges that would fire east to west, toward the 50-foot hill. *See* Am. Tr., Item 25 at p. 1; Knight Deposition at p. 46. This is exactly what the 2007 permit allowed, as it said that "Shooters may only fire their weapons in a direction from east to west perpendicular to and using as a backdrop the 50-foot hill on the western edge of the property." Tr., Item 8, p. 1.

**{¶ 45}** Knight said as much in his deposition. *See* Knight Deposition at p. 54 (agreeing that all the ranges in the 2017 application, as in the 2007 application, were "shooting into that hill that is referred to both in the original 2007 permit and that we're talking about [the 2017 application] today").

**{¶ 46}** According to Tackett's affidavit, there were north ranges and south ranges at the property, and the south ranges were not part of the 2017 outdoor application. Doc. #25, Tackett Affidavit at ¶ 5 and ¶ 15. During his deposition, Knight agreed that the 2017 application was not for the south range. Knight Deposition at p. 66. However, Knight never said that he was unaware of this fact when he denied the 2017 permit.[6] Furthermore, which ranges were at issue was irrelevant. The problem was that shooters did not shoot in the required directions and were improperly supervised.

**{¶ 47}** Knight also said he did not see the need to take a look at the range. His explanation was as follows:

---

[6] We have reviewed the part of the transcript cited for the statement that Chief Knight mistakenly thought the 2017 application was for the south range. The transcript is confusing, but most of Knight's comments appear to refer to revocation of the 2007 application. The comments that refer to the 2017 application indicate a clear awareness that the specific ranges in question involved shooting from east to west. Knight Deposition at pp. 50-53.

I thought the issues that drove my decision on the revocation dealt with direction of fire, the use of the south range, the circumstances that police officers encountered the day they responded to a complaint from Mr. Spencer and approached the range from the south. I didn't – to be frank, the issue regarding the Spencer allegations of rounds arriving on Mr. Spencer's property were of concern, but they weren't the only issue of hand.

The issue wasn't about – the issue in my mind, based on all the information I had available to me at the time, was the discharge of weapons from south – north to south, south to north, contrary to the permit we had issued.

Knight Deposition at p. 65-66.

**{¶ 48}** Thus, the important point is that no matter what the permit said, or which ranges were being used, weapons were being fired in directions not permitted, causing danger to others. The lack of supervision was a contributing factor, and, as noted, Knight was not required to credit promises that supervisory polices would be followed. In this regard, we note Tackett's statement to police officers at the time of the shooting towards officers in September 2017 that " 'I did not know they were shooting from these ranges back here.' " Tr. at Ex. 16 (September 7, 2017 Report of Officer Anderson and Sgt. Flynn).

**{¶ 49}** MVSG's next argument is that Chief Knight could have issued a permit with restrictions and conditions to address valid concerns. However, Knight was not obligated to do so, particularly when the restrictions and conditions in the prior permit had not been observed.

{¶ 50} Finally, MVSG contends that Knight improperly relied on information from an informal meeting with Tackett that occurred in October 2017, which led to the revocation of the 2007 permit. According to MVSG, any reliance would be improper because there was no formal hearing or presentation of evidence. We note that MVSG had an opportunity to appeal from the revocation of the 2007 permit, and failed to do so.

{¶ 51} In this context, MVSG also challenges the trial court's decision to exclude two letters that MVSG's counsel wrote in early October 2017, before the 2007 permit was revoked, and before the November 2017 outdoor permit application was filed. The trial court excluded this correspondence because the only matter before the court was the 2017 revocation. *See* Doc. #31, p. 4.

{¶ 52} After reviewing the record, we find no error or abuse of discretion in the exclusion of these items. In appeals brought under R.C. 2506.01, the court weighs evidence based on the entire record. *Nuwin Realty, LLC v. City of Englewood*, 2017-Ohio-480, 84 N.E.3d 346, ¶ 22 (2d Dist.), citing *Lynch*, 132 Ohio St.3d 92, 2012-Ohio-1975, 969 N.E.2d 1166, at ¶ 12. Here, while revocation of the 2007 permit informed Knight's decision to deny the new permit application, the record was more than adequate without the two letters that Knight's counsel sent in October 2007.

{¶ 53} As noted, the issue of whether the 2007 permit was properly revoked was not appealed and should not be re-litigated. More importantly, MVSG was allowed to depose Knight and to submit Tackett's affidavit. Tackett discussed the background of the permit revocation in detail, including his contention that Spencer's complaints about the range were motivated by Spencer's attempt to actively market the sale of his adjacent property for residential development. Doc. #25, Item 50, Tackett Affidavit at ¶ 7-14 and

¶ 16-23. Tackett's affidavit clearly indicates his position that the 2007 permit was not properly revoked. Between Knight's deposition and Tackett's affidavit, the trial court had a clear picture of the background leading up to the denial of the 2017 outdoor permit, as well as the positions of the opposing parties.

{¶ 54} Based on the preceding discussion, and given the confines of our review, there are no grounds upon which to reverse the judgment of the trial court. *Kisil*, 12 Ohio St.3d at 34, 465 N.E.2d 848. Accordingly, MVSG's assignment of error is overruled.

## III.   Conclusion

{¶ 55} MVSG's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies sent to:

Scott L. Braum
Timothy R. Rudd
Michael W. Sandner
Hon. Dennis J. Adkins